# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **SEAN WATTS** | **CIVIL ACTION** |
| **VERSUS** | **NO. 15-1807** |
| **NATHAN CAIN, II** | **SECTION: "N"(3)** |

## REPORT AND RECOMMENDATION

This matter was referred to this United States Magistrate Judge for the purpose of conducting a hearing, including an evidentiary hearing, if necessary, and submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts.  Upon review of the record, the Court has determined that this matter can be disposed of without an evidentiary hearing.  See 28 U.S.C. § 2254(e)(2).  Therefore, for all of the following reasons, **IT IS RECOMMENDED** that the petition be **DISMISSED WITH PREJUDICE**.

Petitioner, Sean Watts, is a state prisoner incarcerated at the Raymond Laborde Correctional Center in Cottonport, Louisiana.  On June 3, 2011, he was convicted of attempted second degree murder under Louisiana law.[1]  On October 20, 2011, he stipulated to being a second offender and was sentenced as such to a term of twenty-five years imprisonment without benefit of probation, parole, or suspension of sentence.[2]  On December 11, 2013, the Louisiana Fourth

---

[1] State Rec., Vol. 3 of 4, trial transcript, p. 204; State Rec., Vol. 1 of 4, minute entry dated June 3, 2011; State Rec., Vol. 1 of 4, jury verdict form.
[2] State Rec., Vol. 4 of 4, transcript of October 20, 2011; State Rec., Vol. 1 of 4, minute entry dated October 20, 2011; State Rec., Vol. 1 of 4, plea form.

Circuit Court of Appeal affirmed his conviction and sentence.[3]  His related writ application was likewise denied by the Louisiana Supreme Court on June 13, 2014.[4]

Petitioner thereafter filed the instant federal application seeking habeas corpus relief.[5]  The state concedes that the application is timely but argues that petitioner's claims have no merit.[6]

### **Standard of Review**

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") comprehensively overhauled federal habeas corpus legislation, including 28 U.S.C. § 2254.  Amended subsections 2254(d)(1) and (2) contain revised standards of review for pure questions of fact, pure questions of law, and mixed questions of both.  The amendments "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law."  Bell v. Cone, 535 U.S. 685, 693 (2002).

As to pure questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2); see also 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The

---

[3] State v. Norah, 131 So.3d 172 (La. App. 4th Cir. 2013); State Rec., Vol. 3 of 4.
[4] State v. Norah, 140 So.3d 1188 (La. 2014); State Rec., Vol. 4 of 4.
[5] Rec. Doc. 3.  Petitioner's co-defendant, Joseph Norah, was also convicted of attempted second degree murder after their joint trial.  Norah separately sought federal habeas corpus relief, and his petition was recently denied.  Norah v. Leblanc, Civ. Action No. 15-1648, 2016 WL 7191683 (E.D. La. Jan. 11, 2016) (Roby, M.J.), adopted, 2016 WL 7187939 (E.D. La. Dec. 12, 2016) (Morgan, J.).
[6] Rec. Doc. 15.

applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

As to pure questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision on the merits of such a claim unless that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Courts have held that the "'contrary to' and 'unreasonable application' clauses [of § 2254(d)(1)] have independent meaning." Bell, 535 U.S. at 694.

Regarding the "contrary to" clause, the United States Fifth Circuit Court of Appeals has explained:

> A state court decision is contrary to clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the [United States] Supreme Court's cases. A state-court decision will also be contrary to clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of the [United States] Supreme Court and nevertheless arrives at a result different from [United States] Supreme Court precedent.

Wooten v. Thaler, 598 F.3d 215, 218 (5th Cir. 2010) (internal quotation marks, ellipses, brackets, and footnotes omitted).

Regarding the "unreasonable application" clause, the United States Supreme Court has held: "[A] state-court decision is an unreasonable application of our clearly established precedent if it correctly identifies the governing legal rule but applies that rule unreasonably to the facts of a particular prisoner's case." White v. Woodall, 134 S. Ct. 1697, 1706 (2014). However, the Supreme Court cautioned:

> Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably applies this Court's precedent; it does not require state courts to

> extend that precedent or license federal courts to treat the failure to do so as error. Thus, if a habeas court must extend a rationale before it can apply to the facts at hand, then by definition the rationale was not clearly established at the time of the state-court decision.   AEDPA's carefully constructed framework would be undermined if habeas courts introduced rules not clearly established under the guise of extensions to existing law.

Id. (citations and quotation marks omitted).  Therefore, when the Supreme Court's "cases give no clear answer to the question presented, let alone one in [the petitioner's] favor, it cannot be said that the state court unreasonably applied clearly established Federal law."  Wright v. Van Patten, 552 U.S. 120, 126 (2008) (quotation marks and brackets omitted).  The Supreme Court has also expressly cautioned that "an unreasonable application is different from an incorrect one."  Bell, 535 U.S. at 694.  Accordingly, a state court's merely incorrect application of Supreme Court precedent simply does not warrant habeas relief.  Puckett v. Epps, 641 F.3d 657, 663 (5th Cir. 2011) ("Importantly, 'unreasonable' is not the same as 'erroneous' or 'incorrect'; an incorrect application of the law by a state court will nonetheless be affirmed if it is not simultaneously unreasonable.").

While the AEDPA standards of review are strict and narrow, they are purposely so.  As the United States Supreme Court has held:

> [E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable.
>
> If this standard is difficult to meet, that is because it was meant to be.  As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings.  It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no farther.  Section 2254(d) reflects the view that habeas corpus is a guard against *extreme malfunctions* in the state criminal justice systems, *not a substitute for ordinary error correction through appeal.  As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that*

*there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.*

Harrington v. Richter, 562 U.S. 86, 102-03 (2011) (citations omitted; emphasis added); see also

Renico v. Lett, 559 U.S. 766, 779 (2010) ("AEDPA prevents defendants – and federal courts –

from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of

state courts.").

The Supreme Court has expressly warned that although "some federal judges find [28

U.S.C. § 2254(d)] too confining," it is nevertheless clear that "all federal judges must obey" the

law and apply the strictly deferential standards of review mandated therein.  White v. Woodall,

134 S. Ct. 1697, 1701 (2014).

## Facts

In the instant case, petitioner and co-defendant Joseph Norah were charged with the

attempted second degree murder of Dayshawn Brown.  On direct appeal, the Louisiana Fourth

Circuit Court of Appeal summarized the facts of this case as follows:

> At roughly 4 A.M. on April 19, 2010, Mr. Brown drove to Gene's Po-Boys near the corner of St. Claude Avenue and Elysian Fields Avenue.  As he pulled up in front of the Walgreen's store on the opposite side of St. Claude, he noticed an argument occurring between the defendants and three women in front of the po-boy shop.  In an effort to avoid this altercation, Mr. Brown parked, and decided to wait to enter the store.  Mr. Brown passed this time by speaking on the phone with his cousin.
>
> Detective Krister Vilen, in his testimony at trial, estimated that Mr. Brown viewed the defendants from roughly fifty to sixty feet away.  Mr. Brown also testified that, despite not knowing the men and viewing them in the middle of the night, the streetlamp and storefront lighting illuminated the area such that he could clearly see the defendants' faces, hairstyles, and clothing.  Mr. Brown stated that Mr. Watts was wearing white jeans, a white dress shirt, and white shoes, while Mr. Norah was wearing blue jeans and a white t-shirt.  Mr. Brown also noted that one man was "bald-headed," while the other had a "bald fade" haircut.
>
> Mr. Brown then heard one of the defendants shout that he thought Mr. Brown was calling the police.  At that moment, the ongoing altercation ceased, and

5

the defendants got into their red Chevrolet Monte Carlo, and oriented the vehicle such that they were facing the same direction on St. Claude as Mr. Brown's parked car. Mr. Brown, alarmed by this, drove off eventually stopping at the red light governing the intersection of Elysian Fields and North Claiborne Avenue. Mr. Brown testified that the red Monte Carlo driven by the defendants followed him to that intersection. As the red Monte Carlo approached Mr. Brown's stopped vehicle, Mr. Brown heard multiple "pops." Mr. Brown was shot once through his nose and twice in his head – where one bullet still remains – and immediately drove himself to University Hospital.

Before these events, at roughly 3:15 A.M., Officer George Chenevert was dispatched to a separate shooting at The Duck Off, a nightclub located at 2304 A.P. Tureaud Avenue. A 9-1-1 caller stated that a red Monte Carlo vehicle without a license plate was seen fleeing the scene, and Officer Chenevert responded by searching the surrounding neighborhood for that vehicle. After briefly diverting to another call, Officer Chenevert went to the scene of the shooting. While there, Officer Chenevert observed a red Monte Carlo travelling slowly past the scene of the crime, and ran to his patrol car in order to pursue and locate that vehicle.

Officer Chenevert then engaged in a high-speed pursuit, which ended at the 1600 block of Governor Nicholls Street. The defendants fled from their vehicle into a nearby apartment complex. Officer Chenevert, along with several other officers and after being granted permission to search the premises, eventually located the defendants in a bedroom in Kim Powell's apartment.

Detective Vilen arrived at Ms. Powell's apartment about 4:30 A.M. The police conducted searches of Ms. Powell's residence and the red Monte Carlo during which a white tank top, a pair of white and brown shoes, and two white dress shirts were discovered. Detective Vilen then drove to University Hospital to take a statement from Mr. Brown. Detective Vilen noted, and Mr. Brown confirmed at trial, that Mr. Brown was conscious and alert despite the hospital administering morphine for his pain earlier that morning. After taking Mr. Brown's statement, Detective Vilen decided to see if Mr. Brown could identify the defendants through show-up identifications. Out of concern for Mr. Brown's health, the detectives chose to perform the identifications at the hospital.

The show-up identifications took place at roughly 8 A.M., slightly less than four hours after the shooting. While transporting Mr. Brown in a wheelchair from his seventh floor hospital room to a separate waiting area with tinted external glass on the first floor of the hospital, Detective Vilen told Mr. Brown that he wanted Mr. Brown to take a look at some recently arrested suspects, who fit his descriptions and had run from police in a red Mote Carlo.

The defendants were also driven to the hospital at this time. Detective Vilen testified that Mr. Brown could not see the police cars from which the defendants exited; Mr. Brown, however, contradicted this in his testimony. A uniformed officer then individually escorted each defendant, handcuffed, up the loading ramp at the rear of the hospital. Mr. Watts was wearing only white denim jeans and white shoes; while Mr. Norah was wearing a white, crew neck t-shirt and blue jeans

without any shoes.  Mr. Brown viewed both men, and positively identified them – Mr. Watts as the passenger and shooter, and Mr. Norah as the driver.  Detective Vilen testified that it was well-lit outside during Mr. Brown's identifications.

The defendants were then driven back to the station, formally arrested, charged with Attempted Second Degree Murder, and Mirandized.  During interrogation, Mr. Watts admitted to driving around The Duck Off that evening.  The defendants were then transported to Orleans Parish Prison where they made several recorded phone calls.[7]

## Petitioner's Claims

## Improper Identification

Petitioner's first claim is that the state court erred in denying the defense motion to suppress the identification.  On direct appeal, the Louisiana Fourth Circuit Court of Appeal denied that claim, holding:

> [T]he defendants contend that the trial court erred in denying their motion to suppress Mr. Brown's out-of-court identifications.  We disagree and find that the trial judge did not abuse his discretion in denying their motion to suppress, because, while the police used a suggestive "show-up" identification procedure, it did not create a substantial likelihood of misidentification by Mr. Brown.
>
> A
>
> We review a trial court's determination on the admissibility of an out-of-court identification and its subsequent denial of a motion to suppress for abuse-of-discretion.  See State v. Brown, 09-0884, p. 3 (La.App. 4 Cir. 3/31/10), 36 So.3d 974, 978; State v. Bickham, 404 So.2d 929, 934 (La. 1981).  Our review is not limited in scope to the evidence introduced at the hearing on the motion to suppress; rather, our consideration extends to all pertinent evidence adduced at trial.  See State v. Chopin, 372 So.2d 1222, 1224 n. 2 (La. 1979); State v. Williams, 572 So.2d 756, 757 (La.App. 4th Cir. 1990).
>
> The Fifth and Fourteenth Amendments to the United States Constitution strive to protect defendants from unreliable evidence in criminal proceedings through the provision of rights and resources that function to persuade juries that such evidence is untrustworthy.  "Only when evidence 'is so extremely unfair that its admission violates the fundamental conceptions of justice,' have we imposed a constraint [on the evidence's admission] tied to the Due Process Clause."  Perry v. New Hampshire, —— U.S. ——, 132 S.Ct. 716, 723, 181 L.Ed.2d 694 (2012)

---

[7] State v. Norah, 131 So.3d 172, 180-81 (La. App. 4th Cir. 2013); State Rec., Vol. 3 of 4.

(quoting <u>Dowling v. United States</u>, 493 U.S. 342, 352, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990)).

The defendants bear the burden of proof in their motion to suppress this out-of-court identification.  <u>See</u> La.C.Cr.P. art. 703.  <u>See, e.g.</u>, <u>State v. Thibodeaux</u>, 98-1673, p. 20 (La. 9/8/99), 750 So.2d 916, 932; <u>Brown</u>, 09-0884 at p. 4. 36 So.3d at 978 (citing <u>State v. Stovall</u>, 07-0343, p. 16 (La.App. 4 Cir. 2/6/08), 977 So.2d 1074, 1084).  To prevail on such a motion, a defendant must show that the identification procedure in question was suggestive, <u>See</u> <u>Manson v. Brathwaite</u>, 432 U.S. 98, 106, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); <u>Simmons v. United States</u>, 390 U.S. 377, 384-385, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), and that the procedure created a substantial likelihood of misidentification such that defendant was denied due process of law.  <u>See</u> <u>Neil v. Biggers</u>, 409 U.S. 188, 196, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); <u>State v. Prudholm</u>, 446 So.2d 729, 738 (La. 1984).

In proving suggestiveness, a defendant is attempting to show that the police's conduct in organizing and administering the identification was improper.  <u>See</u> <u>Perry</u>, 132 S.Ct. at 724.  We have long-held that an identification is suggestive if the witness' attention is "unduly focused" on the defendant.  <u>See</u> <u>Brown</u>, 09-0884 at p. 5, 36 So.3d at 979; <u>State v. Robinson</u>, 386 So.2d 1374, 1377 (La. 1980).

Suggestiveness of an out-of-court identification alone, however, does not necessitate suppression.  <u>See</u> <u>Perry</u>, 132 S.Ct. at 724.  A <i>per se</i> rule governing the suppression of suggestive identifications would unnecessarily exclude reliable and relevant evidence from the jury's consideration, and focus only on the deterrence of particular police conduct.  <u>See</u> <u>id</u>.

"[T]he Due Process Clause requires courts to assess, on a case-by-case basis, whether improper police conduct created a 'substantial likelihood of misidentification.'"  <u>Id</u>.  In making this determination, the court should look to the totality of the circumstances, <u>See</u> <u>Manson</u>, 432 U.S. at 106, 97 S.Ct. 2243, and assess the reliability of each identification.  <u>See</u> <u>Perry</u>, 132 S.Ct. at 724-725.  The U.S. Supreme Court in <u>Biggers</u> provided factors to examine in this determination: "the opportunity of the witness to view the criminal at the time of the crime, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation."  409 U.S. at 199-200, 93 S.Ct. 375.  "Against these factors is to be weighed the corrupting effect of the suggestive identification itself."  <u>Manson</u>, 432 U.S. at 114, 97 S.Ct. 2243.  Should a court find that a suggestive identification created a substantial likelihood of misidentification, it should exclude the evidence from the jury's consideration at trial.

### B

Mr. Brown identified the defendants through a procedure known as a "one-on-one show-up."  This is "an identification procedure ... whereby a victim is asked whether the victim recognizes the person suspected to be the perpetrator of a crime against the victim."  <u>State v. Harold</u>, 03-0649, p. 6 n. 2 (La.App. 4 Cir. 11/12/03), 861 So.2d 262, 265.  "This type of identification differs from identification through

a photo line-up or a physical line-up, because only one individual is presented to the victim for identification." Id.

A show up, without more, is not suggestive *per se*. See State v. Tapp, 99-2279, p. 14 (La.App. 4 Cir. 5/30/01), 788 So.2d 1215, 1225. These procedures, however, are not favored by law, see State v. Dunbar, 356 So.2d 956, 962 (La. 1978), but are permissible when close in proximity to the crime's occurrence. See Stovall, 07-0343 at p. 17, 977 So.2d at 1085; State v. Felton, 03-0548, p. 4 (La.App. 4 Cir. 10/8/03), 859 So.2d 817, 819.

There is no question that Mr. Brown identified the defendants during a suggestive identification procedure. Detective Vilen and Mr. Brown both testified about this procedure extensively. As stated in Part I, *ante*, Mr. Brown was transported by Detective Vilen to a separate waiting area on the first floor of University Hospital, which had a tinted window looking out onto a loading ramp. While moving Mr. Brown to the waiting area, Detective Vilen told Mr. Brown that the defendants fit his descriptions, and that they had fled from the police in a red Monte Carlo. A police officer then walked each defendant up the ramp individually, while handcuffed. The defendants were in various states of dress – Mr. Watts was shirtless, and Mr. Norah shoeless. Mr. Brown then positively identified each man.

The procedure utilized alone was very suggestive, and Detective Vilen's commentary to Mr. Brown about the defendants makes this procedure highly suggestive. Notably, Detective Vilen admitted that these statements are not usually permitted prior to an identification. Mr. Brown confirmed the influence that these statements had when he testified that he thought that the defendants were likely the perpetrators because they ran from the police. The defendants met their burden of showing that this procedure was suggestive.

This suggestive identification procedure, however, did not create a substantial likelihood of misidentification such that it violated the defendants' due process rights. In making this determination, we consider the Biggers factors.

First, Mr. Brown testified that he had ample opportunity to view the defendants prior to the crime occurring. He was parked roughly fifty to sixty feet away from where the defendants were standing. Both men were standing under bright lighting. Mr. Brown's attention was drawn to the defendants as they were part on an ongoing altercation. Mr. Brown had ample opportunity to see the defendants' faces, clothing, and hairstyles prior to the shooting.

Second, Mr. Brown then provided this description to Detective Vilen in his statement at the hospital. Detective Vilen felt that his description of the defendants was sufficiently thorough to justify performing a "show-up" identification. Finally, roughly four hours after the shooting, Mr. Brown positively identified the men, and provided their respective roles in his attempted murder.

In weighing these factors against corruptive effect of the suggestive identification procedure, we find that Mr. Brown's identification of the defendants was still reliable, and that there was not a substantial likelihood of misidentification.

Accordingly, the trial court did not abuse its discretion in denying the defendants' motion to suppress. We reject this assignment of error.[8]

The Louisiana Supreme Court then likewise denied relief with assigning additional reasons.[9]

Because this claim presents a mixed question of law and fact, this Court must defer to the state court's decision rejecting the claim unless petitioner shows that the decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); Coleman v. Quarterman, 456 F.3d 537, 544 (5th Cir. 2006); Walker v. Vannoy, Civ. Action No. 15-6809, 2016 WL 7485675, at *11 (E.D. La. Sept. 9, 2016), adopted, 2016 WL 7476334 (E.D. La. Dec. 29, 2016). For the following reasons, it is evident that petitioner has not made the required showing.

The law with respect to such claims is clear:

> A two-step process governs the admissibility of identification evidence: First, a court must determine whether the pretrial identification was impermissibly suggestive; if it was, then second, a court must determine whether, under the totality of the circumstances, the suggestiveness leads to a substantial likelihood of irreparable misidentification.

Coleman, 456 F.3d at 544 (quotation marks omitted).

With respect to the first prong of the analysis, it must be noted that "show up" identifications are generally considered impermissibly suggestive. See United States v. Shaw, 894 F.2d 689, 692 (5th Cir. 1990); United States v. Lang, No. 06-30124, 2007 WL 1725548, at *10 (5th Cir. June 14, 2007) ("Although we have not held 'show-up' identifications of this type to be per se suggestive, there is certainly room for concern."); Montez v. Thaler, No. 2:09-CV-051, 2012 WL 487094, at *7 (N.D. Tex. Jan. 27, 2012) ("The Fifth Circuit has not held the use of "show-up"

---

[8] State v. Norah, 131 So.3d 172, 183-85 (La. App. 4th Cir. 2013); State Rec., Vol. 3 of 4.
[9] State v. Norah, 140 So.3d 1188 (La. 2014); State Rec., Vol. 4 of 4.

identifications is per se suggestive, but such identifications are usually considered unduly suggestive."), adopted, 2012 WL 489156 (N.D. Tex. Feb. 15, 2012).  In fact, as the United States Supreme Court has noted that "the practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned."  Stovall v. Denno, 388 U.S. 293, 302 (1967), overruled on other grounds, Griffith v. Kentucky, 479 U.S. 314, 326 (1987). Nevertheless, the use of such a procedure is not unconstitutional *per se*, and "the admission of evidence of a showup without more does not violate due process."  Neil v. Biggers, 409 U.S. 188, 198 (1972).

However, even if the Court assumes that the procedure employed was suggestive in this case, that is only half of petitioner's battle.  In order to prevail, he must also show that, under the "totality of the circumstances," that suggestiveness led to a "substantial likelihood of irreparable misidentification."  As noted, the Louisiana Fourth Circuit Court of Appeal found that it did not.

The state court's determination was not "contrary to" or an "unreasonable application of" clearly established federal law.  The state court identified the correct controlling law on such issues:  Manson v. Brathwaite, 432 U.S. 98 (1977), and Neil v. Biggers, 409 U.S. 188 (1972). Federal law directs courts to utilize five factors in assessing the reliability of an identification:  (1) the witness' opportunity to view the perpetrator at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of witness' description of the perpetrator; (4) the witness' level of certainty concerning the identification; and (5) the time between the crime and the confrontation. Brathwaite, 432 U.S. at 114-15.  Moreover, in its opinion, the Louisiana Fourth Circuit Court of Appeal addressed those factors and concluded that there was no substantial likelihood of irreparable misidentification.  That determination was not unreasonable; on the contrary, the

11

undersigned has reached the same conclusion for the same reasons as noted by the state court. Accordingly, in light of the deferential standards mandated by the AEDPA, this claim should be denied.[10]

### Confrontation Clause

In his second and final claim, petitioner argues that his rights under the Confrontation Clause were violated.  On direct appeal, the Louisiana Fourth Circuit Court of Appeal denied that claim, holding:

> The defendants contend that the trial court, in admitting the recordings of the 9-1-1 telephone calls from The Duck Off shooting, violated their rights under the Confrontation Clause.  The defendants claim that the 9-1-1 callers, who identified the red Monte Carlo and the clothes of the person chasing after the victim, should have testified at trial.  Because the statements made during the 9-1-1 calls were not testimonial, they are beyond the scope and protection of the Confrontation Clause.
>
> ….
>
> A
>
> The Confrontation Clause of the Sixth Amendment to the United States Constitution provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him."  U.S. Const. amend VI.  This right extends to state criminal prosecutions through the Fourteenth Amendment.  See Pointer v. Texas, 380 U.S. 400, 406, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965).
>
> "[T]he principal evil at which the Confrontation Clause is directed was the civil-law mode of criminal procedure, and particularly its use of *ex parte* examinations as evidence against the accused [at trial]."  Crawford v. Washington, 541 U.S. 36, 50, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).  As a result, "[w]here testimonial evidence is at issue ... the Sixth Amendment demands what the common law required:  unavailability [of the witness to testify at trial] and a prior opportunity for [the defendant to] cross-examin[e the witness]."  Id. at 68, 124 S.Ct. 1354.
>
> The contours of the Confrontation Clause's relevance in the inclusion or exclusion of certain hearsay statements at trial are defined by the term "witness" in

---

[10] The undersigned notes that this same claim was also asserted by petitioner's co-defendant in his federal habeas corpus application, and it was likewise denied by Judge Morgan based on the recommendation of Magistrate Judge Roby.  Norah v. Leblanc, Civ. Action No. 15-1648, 2016 WL 7191683, at *5-7 (E.D. La. Jan. 11, 2016), adopted, 2016 WL 7187939 (E.D. La. Dec. 12, 2016).

its text. Id. at 51, 124 S.Ct. 1354. A "witness" is one who "bears testimony." Id. "Testimony" is "a solemn declaration or affirmation made for the purpose of establishing or proving some fact." Id. (internal punctuation omitted). Thus, a statement must be "testimonial" in nature for the procedural protections set forth in Crawford to apply. Whether a statement is "testimonial" has proven to be jurisprudentially enigmatic. The U.S. Supreme Court has abstained from too rigidly defining the parameters of this term, utilizing instead a fluid, situational approach.

In Crawford, the Supreme Court set forth a "core class of testimonial statements," that included "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." Id. at 52, 124 S.Ct. 1354. The Court then found that "[s]tatements taken by police officers in the course of interrogations are ... testimonial" under this standard. Id.

In Davis v. Washington, the Supreme Court clarified when police interrogation produces testimonial statements to include those "solely directed at establishing the facts of a past crime, in order to identify (or provide evidence to convict) the perpetrator." 547 U.S. 813, 826, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006). The Court found a wife's statements in response to a 9-1-1 operator's questions regarding an ongoing domestic abuse incident to be "non-testimonial" since her statements intended to "describe current circumstances requiring police assistance." See Id. at 827, 126 S.Ct. 2266. The Supreme Court was specific to note, however, that this did not universally exempt 9-1-1 call recordings from exclusion under the Confrontation Clause. See Id. at 828, 126 S.Ct. 2266.

Then, the Court in Hammon v. Indiana, consolidated with Davis, found a victim's affidavit to be testimonial when the victim's statements were in response to police questioning about a domestic abuse incident that could no longer be objectively described as an ongoing emergency. See 547 U.S. 813, 829-830, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006). The Court found that the use of an affidavit was sufficiently formal to be testimonial as it functioned as "an obvious substitute for live testimony, because [the statements in the affidavit] do precisely what a witness does on direct examination." Id. at 830, 126 S.Ct. 2266.

Finally, in Michigan v. Bryant, the Court provided a framework to assist lower courts in determining whether a statement qualifies as testimonial. See —— U.S. ——, 131 S.Ct. 1143, 1150, 179 L.Ed.2d 93 (2011) (citing Davis, 547 U.S. at 822, 126 S.Ct. 2266).[FN3] The Court emphasized that "the relevant inquiry is ... the purpose that reasonable participants would have had, as ascertained from the individuals' statements and actions and the circumstances in which the encounter occurred." Id. at 1156. The Court then set forth a three-part inquiry.

[FN3]  In Bryant, police came upon a man suffering from a gunshot wound in a gas station parking lot without knowledge of the whereabouts or the motive of the perpetrator. See Id. at 1156. This broadened the ongoing emergency exception "beyond an initial

victim to a potential threat to the responding police and the public at large." Id. at 1155.

First, we must determine whether there was an "ongoing emergency." This is a "highly context-dependent inquiry." Id. at 1158. Crimes, such as aggravated assault and murder, have much broader "zones of danger" which can extend to the public-at-large and the police. Id. The scope and duration of an "ongoing emergency" can also fluctuate based on consideration of a number of factors, including the type of weapon used in the crime, and the extent and nature of the victim's injuries. In Bryant, the Court found that the police were objectively reasonable in perceiving the situation as an ongoing emergency with possible significant danger to the public and themselves. See id. at 1158-1159. The existence *vel non* of an ongoing emergency, however, is not dispositive of whether a statement is testimonial. See id. at 1165.

Second, we should consider the formality of the interrogation. See id. at 1166. More formal interrogations are generally indicative of non-emergency situations, and "testimonial" statements being given. See id. at 1160.

Third, we should determine the "primary purpose" of the interrogation through examining the statements and actions of both the declarant and the interrogator. See id. at 1162. This inquiry examines both parties as reasonable actors in their actual circumstances, including the severity of the victim's injuries. See id. For example, in Bryant, when the police approached the victim, they simply asked, "What happened?" This question, along with the victim's response providing the factual background of the shooting as well as the identity of his shooter, were objectively reasonable in the context of that ongoing emergency. See id. at 1163.

B

1

At trial, the prosecution introduced the recordings of 9-1-1 calls from three different individuals regarding the shooting at The Duck Off. The first caller began by stating where the shooting had occurred. The operator then questioned the man about the number of shots fired, and the well-being, location, and description of the victim of the shooting. The caller answered these questions, and stated that a red Monte Carlo with no license plate sped off from the area driving toward Claiborne.

The second caller spoke with the operator during three separate calls. The caller stated that she saw a man chasing after the victim, and, in response to a question from the operator, provided as description of the shooter's clothing – a white t-shirt and jeans. During the last of the three calls, the caller is now in a vehicle driving the victim to Tulane Hospital. The operator asks for the victim's name, race, and age, as well as a description of the car that they are driving, the identity of the shooter, and whether anyone else was shot. The caller asks the victim these questions, and provides his answers to the operator.

14

The final caller reports a shooting, and the operator asks for the number of shots fired and what the shooter was wearing.  The caller provides this information as well as that the victim was shot in the side of his chest, and left his truck doors wide open when he was fleeing the shooting.

2

The defendants assert that their rights under the Confrontation Clause were violated when these persons that dialed 9-1-1 and identified the red Monte Carlo and the perpetrator's clothing were not called to testify, and, thus, were not subjected to cross-examination.  The statements on the recordings of the 9-1-1 calls are "non-testimonial," and were made "to enable police assistance to meet an ongoing emergency." Bryant, 131 S.Ct. at 1150 (citing Davis, 547 U.S. at 822, 126 S.Ct. 2266).  Thus, they are not protected by the Confrontation Clause.  In reviewing the defendants' claims, we follow the framework set forth in Bryant.

First, the situation surrounding the shooting at The Duck Off qualifies as an "ongoing emergency."  A shooting is a crime that, by its nature, the police can objectively assume carries one of the greatest risks to the victim, the public, and themselves in responding to the incident.  In this case, a man was shot in public with no indication to the police that the situation had calmed, or that the shooter had surrendered.  The police also had no knowledge of the whereabouts or the motive of the shooter.  The police were objectively reasonable to treat this situation as an ongoing emergency.  Our factual scenario is similar to what occurred in Bryant – a man was shot, a shooter was at-large with a gun, and the injuries to the victim were serious.  See id. at 1158.

Second, the police interrogations during the 9-1-1 calls were informal. Similar to Bryant, the questioning occurred in the immediate aftermath of a shooting, in public, and prior to the arrival of emergency medical services or the police.  See id. at 1160.  This was not, by any means, a formal interrogation.  The questions asked by the operator related to the well-being and location of the victim as well as the whereabouts and identity of the shooter.  Additionally, this situation is more similar factually to Davis than Hammon.  The calls to 9-1-1 came while there was still potential danger to the victim and bystanders that the perpetrator could return to the scene.

Third, the 9-1-1 operator's questions were objectively reasonable as part of the police's response to this ongoing emergency.  Asking callers about the whereabouts of the shooter and the clothing of an active shooter are objectively reasonable responses in the callers' efforts to enable police assistance to meet an ongoing emergency.

The statements contained in the recordings of the 9-1-1 calls were "non-testimonial."  The Confrontation Clause of the Sixth Amendment does not provide procedural protection against the admission of such statements.

The Louisiana Supreme Court then likewise denied relief with assigning additional reasons.[11]

A Confrontation Clause claim presents a mixed question of law and fact.  Fratta v. Quarterman, 536 F.3d 485, 499 (5th Cir. 2008).  Therefore, this Court must defer to the state court's decision rejecting the claim unless petitioner demonstrates that the decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).  Here, petitioner has not made that showing.

Once again, the state court correctly identified the controlling clearly established federal law, i.e. the Crawford and Davis decisions.  In Davis, the Supreme Court explained:

> The Confrontation Clause of the Sixth Amendment provides:  "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him."  In Crawford v. Washington, 541 U.S. 36, 53-54, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), we held that this provision bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination."  A critical portion of this holding ... is the phrase "testimonial statements."  Only statements of this sort cause the declarant to be a "witness" within the meaning of the Confrontation Clause.  See id., at 51, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177.  It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause.

Davis, 547 U.S. at 821.  The Supreme Court continued:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency.  They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

Id. at 822.

---

[11] State v. Norah, 140 So.3d 1188 (La. 2014); State Rec., Vol. 4 of 4.

Interestingly, <u>Davis</u>, like the instant case, also involved a Confrontation Clause claim based on the admission of a recording of a 911 call.  In considering the claim, the Supreme Court noted: "If 911 operators are not themselves law enforcement officers, they may at least be agents of law enforcement when they conduct interrogations of 911 callers.  For purposes of this opinion (and without deciding the point), we consider their acts to be acts of the police."  <u>Id</u>. at 823.  The Supreme Court then went on to hold that statements made in a 911 call seeking immediate police assistance generally are not "testimonial" in nature and, therefore, pose no Confrontation Clause problems.  The Supreme Court explained:

> [The 911 caller] simply was not acting as a *witness*; she was not testifying.  What she said was not "a weaker substitute for live testimony" at trial, <u>United States v. Inadi</u>, 475 U.S. 387, 394, 106 S.Ct. 1121, 89 L.Ed.2d 390 (1986), like Lord Cobham's statements in <u>Raleigh's Case</u>, 2 How. St. Tr. 1 (1603), or Jane Dingler's *ex parte* statements against her husband in <u>King v. Dingler</u>, 2 Leach 561, 168 Eng. Rep. 383 (1791), or Sylvia Crawford's statement in <u>Crawford</u>.  In each of those cases, the *ex parte* actors and the evidentiary products of the *ex parte* communication aligned perfectly with their courtroom analogues.  [The 911 caller's] emergency statement does not.  No "witness" goes into court to proclaim an emergency and seek help.

<u>Davis</u>, 547 U.S. at 828.

For the reasons explained by the state court, there was no Confrontation Clause violation because the 911 calls were not testimonial in nature.  Accordingly, petitioner has once again failed to show that the state court decision was contrary to, or involved an unreasonable application of, clearly established federal law.  Therefore, the AEDPA likewise requires this federal habeas Court to defer to the state court decision and reject this claim.[12]

---

[12] The undersigned notes that this same claim was also asserted by petitioner's co-defendant in his federal habeas corpus application, and it was likewise denied by Judge Morgan based on the recommendation of Magistrate Judge Roby.  <u>Norah v. Leblanc</u>, Civ. Action No. 15-1648, 2016 WL 7191683, at *7-9 (E.D. La. Jan. 11, 2016), <u>adopted</u>, 2016 WL 7187939 (E.D. La. Dec. 12, 2016).

## RECOMMENDATION

It is therefore **RECOMMENDED** that the federal application for habeas corpus relief filed by Sean Watts be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  28 U.S.C. § 636(b)(1); Douglass v. United Services Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).[13]

New Orleans, Louisiana, this tenth day of February, 2017.

**DANIEL E. KNOWLES, III**
**UNITED STATES MAGISTRATE JUDGE**

---

[13] Douglass referenced the previously applicable ten-day period for the filing of objections.  Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.

18